# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49794-8-II |
| Respondent, | |
| v. | |
| WILLIAM MANUEL ALVAREZ CALO, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — William Manuel Alvarez Calo appeals his jury trial convictions for first degree felony murder and first degree burglary, as well as his conviction for attempted first degree robbery that merged with this first degree felony murder conviction.  He argues that (1) the trial court erred in admitting audio and video recordings of four interviews that he gave to the police before he was charged with the current offenses, (2) the evidence is insufficient to support the attempted first degree robbery conviction, and (3) the trial court erred when it failed to remove all references to the merged attempted first degree robbery conviction from the judgment and sentence.  Calo also raises numerous claims in his statement of additional grounds for review (SAG).[1]  Additionally, in supplemental briefing, Calo challenges the imposition of certain legal financial obligations (LFOs) in light of our legislature's 2018 amendments to the LFO statutes.

---

[1] Calo raises 14 categories of claims in his SAG.  Because the issues are so numerous, we describe the SAG claims in more detail below.

We hold that (1) the trial court did not err when it denied Calo's motion to suppress the four police interviews, (2) the evidence is sufficient to support the attempted first degree robbery conviction, and (3) the judgment and sentence must be amended to strike all references to the vacated attempted first degree robbery conviction. We further hold that Calo is not entitled to relief based on any of the grounds he raises in his SAG. Finally, we hold that because the 2018 amendments apply to this case, the trial court should reexamine the $200 filing fee, the $100 deoxyribonucleic acid (DNA) collection fee, and the interest provisions it originally imposed in light of those amendments. Accordingly, we affirm the convictions but remand this matter to the trial court for further action consistent with this opinion.

FACTS[2]

I. BACKGROUND

A. THE MURDER AND INITIAL INVESTIGATION

On November 12, 2012, Robert Smith, Jiffary Mendez, Michael Rowland, Fidel Gaytan Gutierrez, Mazzar Robinson, and Ray Turner arrived at Juan Hidalgo-Mendoza's apartment in an area of Lakewood, Washington, known as Chocolate City because of its reputation as a place to go to obtain heroin, intending to steal drugs and money. Upon entering the apartment, one of the men shot and killed Jaime Diaz-Solis. All of the men immediately fled.

Hidalgo-Mendoza, who had been in another room when the shooting occurred, fled the apartment through the bedroom window and had a neighbor contact the police. He then returned to the apartment and discovered that Diaz-Solis had been shot. Hidalgo-Mendoza moved Diaz-

---

[2] Additional facts related to several of Calo's SAG issues are set out below.

Solis outside and then removed a gun, drugs, and $38,000 from the apartment and put them under the neighbor's deck and in his truck. When the paramedics arrived, they attempted to revive Diaz-Solis, but they were unable to do so. Diaz-Solis died from the gunshot wound.

During the murder investigation of Diaz-Solis, officers found the items Hidalgo-Mendoza had hidden under the deck. Law enforcement officers later discovered large amounts of heroin and methamphetamine hidden inside the walls of Hidalgo-Mendoza's apartment. Hidalgo-Mendoza and his cousin Alberto Mendoza Ortega, who was also known as Yeto,[3] were subsequently charged with drug trafficking related to the drugs found in the apartment. But several months passed without a lead in the murder investigation.

## B. CALO'S POLICE INTERVIEWS[4]

### 1. FEBRUARY 22 INTERVIEW

In February 2013, Calo was charged in Lakewood with a misdemeanor driving offense and in Pierce County with second degree identity theft and third degree driving with a suspended license. On February 11, Calo asked Kristin Fay, his attorney in the Lakewood misdemeanor matter, to put him in contact with the officers who were investigating Diaz-Solis's murder. Calo told Fay that he wanted to provide information on the murder in exchange for the dismissal of his

---

[3] To avoid potential confusion with Hidalgo-Mendoza, we refer to Mendoza Ortega as Yeto throughout. We intend no disrespect.

[4] The facts in this section are based on the trial court's unchallenged findings of fact following the suppression hearing. *See State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006) (unchallenged findings of fact are verities on appeal). Because Calo challenges portions of findings of fact 20 and 26, we do not use the challenged portions of those findings in this section.

Lakewood and Pierce County cases. Fay continued the Lakewood case so she could consult her supervisor Ken Harmell.

Fay consulted Harmell and attempted to contact Mary Kay High, Calo's counsel on his Pierce County felony charge. Fay was unable to contact High. Sometime after February 11, Fay "caused a message to be sent to Detective [Les] Bunton" about Calo's request. Clerk's Papers (CP) at 232.

On February 22, Calo, who was in custody on a felony charge in Pierce County, was brought from the Pierce County Jail to the Lakewood Municipal Court for a hearing on the Lakewood matter. Harmell assumed Calo's representation in the Lakewood matter. Detective Bunton and Lakewood Police Department Investigator Jason Catlett were also present, and they talked to Harmell about speaking with Calo.

Harmell then met with Calo and an interpreter to discuss whether Calo should talk to the officers. During the 20- to 30-minute meeting, Harmell told Calo that he (Harmell) thought it "was a bad idea to talk with the detectives" and expressed his concern about Calo's safety due to the type of information Calo was planning to provide. CP at 233. Calo dismissed Harmell's attempt to talk him (Calo) out of meeting with the officers and "was not concerned about being implicated and was positive that he would not get caught up with the murder." CP at 233. Despite Harmell's advice, Calo agreed to talk to the officers at the Lakewood Police Station.

Detective Bunton and Investigator Catlett transported Calo to the Lakewood Police Station for the interview.[5] At that time, Calo was in jail clothing and was handcuffed. Because he was in custody on the Pierce County charges, Calo was not free to leave.

At no point during the interview process did the officers advise Calo of his *Miranda*[6] rights. Calo told the officers about his contacts and involvement with a narcotics cartel, identified the photographs of some of the people he was talking about, and implicated some of his associates in the murder.[7]

Although "Harmell [had] declined to accompany . . . Calo to the interview," Harmell subsequently talked to the prosecutors in both matters about dismissing the pending charges against Calo. CP at 233. Harmell also attempted to contact High about the felony case. Calo's Lakewood misdemeanor case was dismissed on March 5. On March 13, the Pierce County felony case was dismissed, and Calo ultimately pleaded guilty to an amended charge of one count of second degree driving while license suspended.

2.      MARCH 18 INTERVIEW

On March 18, Calo, who was no longer in custody, met with the officers for a second time at the Lakewood Police Department. The officers did not advise Calo of his *Miranda* rights during this interview.

---

[5] Detective Bunton testified that they interviewed Calo at the police station so other inmates did not see him talking to the police at the Lakewood Municipal Court.

[6] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[7] The interview was largely in English, but Investigator Catlett periodically acted as an interpreter during the interview. We describe this interview in more detail below.

During this interview, Calo provided more information about the murder and drug trafficking activities and identified some suspects from photo montages. The officers questioned Calo about other evidence they had obtained that contradicted part of his February 22 statement.

At this time, Investigator Catlett agreed to pay Calo, and Calo "was acting as a paid informant." CP at 234. Calo met with Investigator Catlett at least two more times before March 26, but these meetings were not recorded.

3.      MARCH 26 INTERVIEW

On March 26, Calo, who was still not in custody, met for a third time with the officers at the police station. Again, the officers did not advise Calo of his *Miranda* rights despite having probable cause to believe that Calo was "a co-conspirator or was rendering criminal assistance." CP at 234.

During this interview, Calo "made incriminating statements including that he had a part in arranging the hit to happen." CP at 234. After this meeting, the officers spoke to the prosecutor and had probable cause to arrest Calo for murder and conspiracy.

4.      JUNE 21 INTERVIEW AND ARREST

On June 21, Calo met with the officers in an unmarked police vehicle. This time, the officers advised Calo of his *Miranda* rights.

Investigator Catlett read Calo his rights in English because Calo told them that he was dyslexic and did not read English well. After signing the waiver form and talking to the officers for 45 minutes to an hour, the officers arrested Calo.

II. PROCEDURE

The State charged Calo with first degree felony murder (count I), conspiracy to commit first degree murder (count II), first degree burglary (count III), attempted first degree robbery (count IV), and tampering with a witness based on Calo having contact with Mendez while in jail (count V). The State alleged that the predicate offense for the felony murder charge was either first degree robbery or first degree burglary. Calo was assisted by an interpreter throughout proceedings on these charges. The trial court later dismissed the conspiracy to commit first degree murder charge.

A. CrR 3.5 HEARING

Before trial, Calo moved to suppress the statements he made during the February 22, March 18, March 26, and June 21 interviews. Calo argued that his statements should be suppressed because Harmell and Fay provided ineffective assistance of counsel by "encourage[ing] him to submit to a custodial interrogation providing information about involvement in a murder without ever advising him of the risks and possible consequences." CP at 1. He further argued that the statements were inadmissible because (1) he was in custody when he made the statements and was not advised of his *Miranda* rights and (2) despite having probable cause, the officers delayed his arrest in order to obtain his statements.

Detective Bunton, Investigator Catlett, Fay, Harmell, High, and Pierce County Deputy Prosecutor Sven Nelson testified at the suppression hearing. The video and audio tapes of the four interviews were played for the trial court.

In the video of the February 22 interview, Detective Bunton and Investigator Catlett heard from Calo about his involvement in drug trafficking with several individuals, including Yeto and

7

Gerardo Hernandez-Sandoval, whom Calo knew as Borrego. Calo stated that he had been in jail for identity theft shortly before the murder and that he ended up being confined with Borrego. Without prompting from the officers, Calo told them that Borrego had asked him to tell Yeto that Borrego wanted Hildago-Mendoza and anyone else present in the house at the same time to be killed.

Calo told the officers that he communicated Borrego's message to Yeto after Yeto arranged for Calo's bail and release. Calo also stated that Yeto called him the night of the murder and asked Calo to send someone to pick him (Yeto) up in Chocolate City. Yeto also called Calo that day and threatened to kill Calo if he contacted the police.

The video showed that although the February 22 interview was held in a secured interview room, Calo was not physically restrained during the interview. The interview had a conversational tone, and although the officers asked Calo follow-up questions to clarify what he had said and the timeline and to confirm the identities of the people involved, the officers did not generally direct the conversation. In addition to talking about what he knew about the murder, Calo stated that he wanted his current felony charge dropped because he wanted to retain his right to have firearms so he could protect himself.

Calo also expressed concern about being sent back to jail after talking to the officers; he asked that they not contact him at the jail and that they get him out of the jail as soon as possible. At the end of the interview, Calo asked the officers if he could smoke, and the officers responded that he could not smoke in the interview room but that they would arrange it so he could smoke and provide him with a cigarette in a few minutes.

8

Based on these facts and the facts[8] set out above in section I.B., *supra*, the trial court admitted Calo's February 22, March 18, March 26, and June 21 statements.[9]

## B. TRIAL

### 1. TESTIMONY

At trial, the State presented evidence that Calo worked for Yeto and assisted him with his drug sales. Yeto, in turn, got his drugs from Hidalgo-Mendoza.

The State also presented evidence that Calo worked as a mechanic in a garage that Yeto rented. Calo's relationship with Yeto eventually deteriorated over disagreements about drugs, money, and Calo's performance, and Calo stopped working for Yeto. At this point, Calo owed $25,000 to $30,000 to Yeto.

In October 2012, Calo was arrested. Yeto, Mendez, and some of Calo's other friends bailed him out of jail. After this, Calo started working for another drug supplier.

After Calo got out of jail and his debt to his new supplier started to mount, Calo started talking to Mendez and others at the garage about wanting to rob and murder Yeto and take his place in the drug trade. According to Mendez and Jacinto Uscanga, on the night of the murder, Calo met with several of his friends at his garage to discuss a plan to steal Yeto's drugs and, possibly, kill him. They also discussed a plan to raid Hidalgo-Mendoza's apartment and steal any

---

[8] The trial court also reviewed recordings of the other interviews, but the details of those interviews are not relevant here.

[9] The trial court initially ruled that the March 26 and June 21 statements were not admissible under *State v. Dictado*, 102 Wn.2d 277, 291, 687 P.2d 172 (1984), *overruled by State v. Harris*, 106 Wn.2d 784, 789-90, 725 P.2d 975 (1986). But the trial court revised this ruling on reconsideration and ruled that these statements were admissible because *Dictado* had been abrogated by *Harris* and *State v. Lorenz*, 152 Wn.2d 22, 93 P.3d 133 (2004).

drugs or money. As they were making plans, the person who had been recruited to shoot Yeto declined to participate, but the plan to raid Hidalgo-Mendoza's apartment remained in play. Before the men left the garage, Calo provided some of them with firearms.

According to Smith and Mendez, although Calo and his cohorts knew that Hidalgo-Mendoza's apartment might be empty and the apartment appeared empty when the men arrived, they were aware that someone could be home and they were prepared to go through with their plans even if people were there. The men planned to restrain anyone who was present and they took duct tape and zip ties with them when they entered the apartment.

Smith testified that when the men entered the apartment through an unlocked back door, Robinson shot Diaz-Solis. The men immediately fled the scene.

The State also played redacted versions of the four police interviews for the jury. Investigator Catlett also testified about the interviews.

Investigator Catlett testified that during the February 22 interview, Calo stated that when he was in jail in October 2012, Borrego gave him a message to deliver to Yeto. The message stated that Borrego wanted Hidalgo-Mendoza killed. Calo said that he passed Borrego's message on to Yeto and that on the night of the murder, Yeto had called him for a ride "out of the Chocolate City area." 16 Verbatim Report of Proceedings (VRP) at 1830. Calo also offered to provide the officers with information on drug trafficking in the area.

Investigator Catlett further testified that during the March 18 interview, Calo provided more detail and admitted that he had lied about Yeto calling for a ride on the night of the murder. Instead, Calo told the officers that it was "two black males," Robinson and another man Calo referred to as "Sweet," who needed to be picked up in Chocolate City. 16 VRP at 1839-40.

10

Investigator Catlett then testified that during the March 26 interview, Calo stated that he had contacted Robinson and asked him to "kill and rob . . . Hidalgo-Mendoza and whoever else might be there." 16 VRP at 1911-12. Calo said that he had offered Robinson $10,000 and the drugs or money in the apartment. Calo also admitted that he had someone show Robinson where the apartment was.

Investigator Catlett further testified that during the June 21 interview, Calo admitted that he and the others had met at his garage before the shooting and then returned to his garage. Calo also admitted once again that he had met with Robinson and had arranged the robbery and murder with him. Calo asserted, however, that he was just following Borrego's and Yeto's orders because he feared for his life.

The defense did not present any evidence.

2.    VERDICT, SENTENCING, AND JUDGMENT AND SENTENCE

The jury found Calo guilty of first degree felony murder, first degree burglary, and attempted first degree robbery. It acquitted Calo of the witness tampering charge. The jury also found by special verdict that Calo, acting as a principal or an accomplice, committed or attempted to commit both first degree robbery and first degree burglary.[10]

At sentencing, the trial court found that the attempted first degree robbery "merge[d]" with the first degree felony murder conviction. 25 VRP at 2830. In the judgment and sentence, the trial court crossed out the attempted first degree robbery entry in the "current offenses" section of the judgment and sentence and handwrote the word "merges" next to the crossed-out entry. CP at

---

[10] The jury also found that Calo had been armed with a firearm when he committed the murder, the burglary, and the attempted robbery offenses.

213. However, the judgment and sentence noted that the jury had returned a finding that Calo was armed with a firearm when he committed the attempted first degree robbery, and the trial court did not remove this reference. Calo appeals.

## ANALYSIS

Calo argues that (1) the trial court erred in admitting the audio and video recordings of the four police interviews, (2) the evidence is insufficient to support the attempted first degree robbery conviction, and (3) the trial court erred when it failed to remove all references in the judgment and sentence to an attempted first degree robbery conviction. Calo also raises numerous issues in his SAG. Although we agree that we must remand for correction of the judgment and sentence, we otherwise affirm.

### I. ADMISSION OF POLICE INTERVIEWS

Calo contends that the trial court erred when it admitted the audio and video recordings of his four police interviews. We disagree.

### A. STANDARD OF REVIEW

We review the trial court's ruling on a motion to suppress evidence to determine whether substantial evidence supports the trial court's findings of fact and whether those findings, in turn, support the trial court's conclusions of law. *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014). "Substantial evidence is 'evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.'" *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006) (quoting *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999), *abrogated on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)). We review a trial court's

legal conclusions de novo. *Levy*, 156 Wn.2d at 733. Unchallenged findings of fact are verities on appeal. *Levy*, 156 Wn.2d at 733.

## B. CUSTODY ARGUMENT

Calo first argues that the trial court erred when it concluded that Calo was not in custody during the February 22 interview.[11] He argues that the fact he was in custody on other charges and not free to leave establishes he was in custody for purposes of *Miranda* when he talked to the officers on February 22.[12] We disagree.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, or be deprived of life, liberty, or property without due process of law." "In *Miranda*, . . . the Supreme Court established a conclusive presumption that all confessions or admissions made during a *custodial* interrogation are compelled in violation of the Fifth Amendment's privilege against self-incrimination." *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 682, 327 P.3d 660 (2014) (emphasis added), *abrogated on other grounds by State v. Gregory*, ___ Wn.2d ___, 427 P.3d 621 (2018). The State may overcome this presumption by "showing that law enforcement officials informed the suspect of his or her right to remain silent and right to an attorney and that the suspect knowingly and intelligently waived those rights." *Cross*, 180 Wn.2d at 682. But the right to *Miranda* warnings attaches only when there is a *custodial* interrogation. *State v. Templeton*, 148 Wn.2d 193, 208, 59 P.3d 632 (2002). "When a prisoner is questioned, the determination of custody should focus on

---

[11] This challenge relates to the trial court's conclusion of law 2.

[12] We note that here, Calo argues only that he was in "custody" when he spoke to the officers. He does not discuss whether this was an "interrogation." He does raise "interrogation" in his SAG.

all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Howes v. Fields*, 565 U.S. 499, 514, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012).

Relying on *State v. Sargent*, 111 Wn.2d 641, 648, 762 P.2d 1127 (1988), Calo argues that the critical inquiry here is whether his freedom of movement was restricted and that during the February 22 interview he was in custody because he could not simply walk away from the officers and terminate the conversation. In *Sargent*, our Supreme Court concluded that Sargent was in a custodial setting when he was locked in one side of a booth in the King County Jail's visiting area during a presentence interview conducted by a probation officer. 111 Wn.2d at 649. The court stated that "[t]he critical inquiry" was "whether [the defendant's] freedom of movement was restricted" and concluded that the fact Sargent, who was already in custody, was in jail and locked in an interview booth were "restraints on his freedom of movement" sufficient to "constitute custody for *Miranda* purposes." *Sargent*, 111 Wn.2d at 649.

But our Supreme Court more recently explained in *State v. Warner* that "[w]hen dealing with a person already incarcerated, 'custodial' means more than just the normal restrictions of freedom incident to incarceration." 125 Wn.2d 876, 885, 889 P.2d 479 (1995). To establish a "custodial" relationship when the defendant is already incarcerated, "[t]here must be more than the usual restraint." *Warner*, 125 Wn.2d at 885.

In determining whether there was more than the usual restraint, we find *Howes* helpful. In *Howes*, the Supreme Court expressly rejected the premise that a prisoner is always in custody for purposes of *Miranda* if he is taken aside and questioned about events that occurred outside the prison walls. 565 U.S. at 508. Instead, as noted above, the Court held that "[w]hen a prisoner is

14

questioned, the determination of custody should focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Howes*, 565 U.S. at 514. The ultimate goal is to protect the defendant from "circumstances that are thought generally to present a serious danger of coercion." *Howes*, 565 U.S. at 508-09.

Here, law enforcement did not "summon" Calo to the interview on its own accord. Rather, Calo initiated the February 22 contact with the officers and spoke to them against his counsel's advice. Although Calo was not free to simply walk away because he was in custody on other matters, the police did not interrogate Calo; instead, Calo volunteered his statements. And his restraint was no more than what was required because of his preexisting status as a prisoner and the need to protect Calo from the other prisoners being aware that he was speaking to law enforcement.

Furthermore, the tone of the interview was not that of an interrogation—Calo sought out the officers and freely offered information about the murder and other matters without being directed to by the officers. And there was nothing indicating that Calo could not have chosen to end the interview at any time without any consequence other than being returned to his original custody status. Moreover, it was clear that the officers talked to Calo at the police station in an attempt to prevent other prisoners from knowing that Calo was speaking to them, not in order to exert extra pressure on Calo.

Additionally, the interview did not present a serious danger of coercion. Calo argues that the only way he could negotiate his way out of custody on the Pierce County and Lakewood matters was to cooperate with the Lakewood officers. But belief that cooperation might lead to

more lenient treatment is not the type of compulsion contemplated in *Miranda*. *Warner*, 125 Wn.2d at 884.

Accordingly, we hold that the trial court did not err when it found that Calo was not in custody for purposes of *Miranda* protections during the February 22 interview.

## C. PROBABLE CAUSE ARGUMENT

Citing *State v. Dictado*, 102 Wn.2d 277, 291, 687 P.2d 172 (1984), *overruled by State v. Harris*, 106 Wn.2d 784, 789-90, 725 P.2d 975 (1986), Calo next argues that the trial court erred in admitting all four interviews because once Calo started to incriminate himself and once probable cause to arrest him was established, the officers were required to advise him of his *Miranda* rights.[13] Because *Dictado* has not been good law since 1986, we disagree.

In *Dictado*, our Supreme Court held that although "'mere suspicion before the facts are reasonably developed is not enough to turn routine investigatorial questioning of a witness into a custodial interrogation' for the purposes of requiring *Miranda* warnings . . . , [o]nce the police have probable cause to arrest a suspect . . . delay in making the arrest cannot serve as an excuse for conducting interviews without *Miranda* warnings." 102 Wn.2d at 291 (quoting *State v. Green*, 91 Wn.2d 431, 436, 588 P.2d 1370 (1979), *rev'd on other grounds*, 94 Wn.2d 216, 616 P.2d 628 (1980), and citing *State v. Lewis*, 32 Wn. App. 13, 645 P.2d 722 (1982)). But two years later, our Supreme Court issued *Harris* in which it held that the United States Supreme Court case *Berkemer v. McCarty*[14] had modified the "'probable cause to arrest' standard" used in *Dictado*. 106 Wn.2d

---

[13] This argument appears to challenge the trial court's conclusions of law 11 and 12, to which Calo assigns error.

[14] 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

at 790. Under *Berkemer*, the test for when *Miranda* warnings are required is whether the "'suspect's freedom of action is curtailed to a degree associated with formal arrest.'" *Harris*, 106 Wn.2d at 789-90 (internal quotation marks omitted) (quoting *Berkemer*, 468 U.S. at 440). Because *Miranda* warnings were not required merely because the officers may have developed probable cause to arrest Calo during the interviews, this argument fails.[15]

### D. FIFTH AND SIXTH AMENDMENT RIGHT TO COUNSEL ARGUMENTS

Calo next argues that the February and March interviews violated his right to counsel under both the Fifth and the Sixth Amendments to the United States Constitution. He asserts that the officers "intentionally circumvented [his] Fifth Amendment right to counsel by never advising him of his *Miranda* rights." Corrected Br. of Appellant at 26. He also asserts that the officers violated his Sixth Amendment right to counsel by continuing to interview him despite knowing that he was represented by counsel and that his counsel did not want the officers to question him. We disagree.

---

[15] Calo also relies on *State v. Wood*, 45 Wn. App. 299, 309, 725 P.2d 435 (1986), and *State v. Lewis*, 32 Wn. App. 13, 645 P.2d 722 (1982). But these cases relied on *Dictado*, which was expressly rejected in *Harris*.

In addition, Calo relies on *State v. Hawkins*, 27 Wn. App. 78, 615 P.2d 1327 (1980), asserting that once a defendant is in police custody and provides incriminating evidence, *Miranda* is required. But in *Hawkins*, we held that the defendant was in custody for purposes of *Miranda*, not just because the officers had probable cause to arrest the defendant but because the officers told the defendant that he was not free to leave after they confirmed an outstanding fugitive warrant, which is not the situation here. 27 Wn. App. at 82. Similarly, Calo relies on *State v. France*, 129 Wn. App. 907, 909, 120 P.3d 654 (2005). As in *Hawkins*, but unlike here, the officers told the defendant that he was not free to leave when the interrogation occurred. *France*, 129 Wn. App. at 910. Neither *Hawkins* nor *France* stand for the proposition that a defendant is entitled to *Miranda* warnings solely because probable cause to arrest exists.

As to Calo's Sixth Amendment[16] claim, the United States Supreme Court confirmed that the Sixth Amendment right to counsel is "'offense specific.'" *Texas v. Cobb*, 532 U.S. 162, 167-68, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991)). That right does not attach to an uncharged offense unless the uncharged offense is "considered the same offense under the *Blockburger* test." *Cobb*, 532 U.S. at 173 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Additionally, a defendant cannot invoke the Sixth Amendment right to counsel until a prosecution is commenced "'at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *McNeil*, 501 U.S. at 175 (internal quotation marks omitted) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984)).

Here, the officers questioned Calo about matters that were entirely unrelated to the charges for which he had counsel. And at the time of the interviews, no prosecution had been commenced on any charges related to the information Calo provided during the interviews. Accordingly, Calo had no Sixth Amendment right to counsel in relation to the new charges. Thus, the officers' questioning of him did not circumvent his Sixth Amendment right to counsel.[17]

Citing to *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985), and *State v. Everybodytalksabout*, 161 Wn.2d 702, 708, 166 P.3d 693 (2007), Calo argues that

---

[16] The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e."

[17] In his SAG, Calo also appears to assert that he did not voluntarily waive his Sixth Amendment right to counsel. But as discussed in this section, the Sixth Amendment right to counsel is offense specific and does not apply here.

"[o]nce the right to counsel has attached, the State is prohibited from knowingly circumventing that requirement, and from deliberately eliciting information in contravention of that requirement." Corrected Br. of Appellant at 27. But these cases are not persuasive because, unlike here, the information solicited during the contacts with law enforcement at issue in *Moulton* and in *Everybodytalksabout* was used in the matters in which the defendants' Sixth Amendment right to counsel had attached. *See Moulton*, 474 U.S. at 166-67; *Everybodytalksabout*, 161 Wn.2d at 705-06.

As to Calo's Fifth Amendment claim, that claim rests on his assertion that he was entitled to *Miranda* warnings. But as discussed in sections I.B. and I.C. of this analysis, *supra*, Calo was not entitled to *Miranda* warnings. Because he was not entitled to *Miranda* warnings during the February and March interviews, the officers did not circumvent his Fifth Amendment right to counsel when they conducted those interviews.

### E. INEFFECTIVE ASSISTANCE OF COUNSEL ARGUMENT

Calo next argues that the trial court should have suppressed his statements because Harmell provided ineffective assistance of counsel under the Fifth Amendment by failing to properly advise him (Calo) of the legal risks of providing a statement about the murder and by allowing Calo to be questioned by the officers without counsel present. This argument also fails.

Claims of ineffective assistance of counsel are generally rooted in the Sixth Amendment. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). But, as noted above, the Sixth Amendment is offense specific and comes into play "only at or after the time that adversary judicial proceedings have been initiated against [the defendant]." *Gouveia*, 467 U.S. at 187-88. Because the interviews at issue took place before the start of any proceedings against Calo related to those

interviews and the interviews did not relate to the charges that Harmell represented him on, Calo had no Sixth Amendment right to effective assistance of counsel from Harmell at the time of the interviews as it relates to the charges now at issue.

Furthermore, the Fifth Amendment right to assistance of counsel does not attach unless the interrogation is a *custodial* interrogation. *Miranda*, 384 U.S. at 469-70. Because Calo has not shown that the February 22 interview was a custodial interrogation,[18] Calo fails to establish ineffective assistance in violation of the Fifth Amendment as it relates to the charges now at issue because his right to counsel in this matter had not attached.

Calo relies on *Commonwealth v. Celester*, 473 Mass. 553, 45 N.E.3d 539 (2016). But unlike here, in *Celester* there was no dispute that interrogation at issue was a custodial interrogation. *See* 473 Mass. at 572. Here, in contrast, Calo has not established that the first three interviews were custodial interrogations and he waived his right to counsel during the June 21 interview.

Calo fails to show that the trial court erred when it admitted his four statements.[19]

---

[18] Although Calo assigns error to the findings of fact and conclusions of law addressing whether he was in custody for all four interviews, the only argument addressing his custody status relates to his February 22 interview. Accordingly, we limit our analysis of whether Calo was in custody to the February 22 interview. *See* RAP 10.3(a)(6); *State v. Bello*, 142 Wn. App. 930, 932 n.3, 176 P.3d 554 (2008) ("We need not consider arguments that a party has not developed in the briefs and for which the party has cited no authority.")

[19] Because we hold that Calo's suppression arguments fail, we need not address Calo's fruit of the poisonous tree argument.

## II. SUFFICIENCY OF EVIDENCE: ATTEMPTED FIRST DEGREE ROBBERY

Calo next argues that the evidence was insufficient to support the attempted first degree robbery conviction because the State failed to prove beyond a reasonable doubt that he or an accomplice intended to take property from or in the presence of another person. He asserts that because the evidence shows that he and his accomplices thought the apartment would be unoccupied, they could not have intended to take property from or in the presence of another person. The State asserts the issue is moot. But even if we address this issue on the merits, Calo's argument fails.

To determine whether the evidence is sufficient to sustain a conviction, we "view the evidence in the light most favorable to the State and decide whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *State v. Mines*, 163 Wn.2d 387, 391, 179 P.3d 835 (2008). And we defer to the fact finder on issues of witness credibility. *Mines*, 163 Wn.2d at 391.

To prove the attempted first degree robbery charge, the State had to prove beyond a reasonable doubt that Calo or an accomplice attempted to "take[] personal property from the person of another or in his or her presence." RCW 9A.56.190. Although the evidence at trial showed that Calo and his accomplices knew that the apartment *might* be empty and that it appeared empty when they arrived, there is additional evidence that they were aware that the occupants could be present and that they were prepared to go through with their plans even if people were present. Smith and Mendez both testified that the group had planned to go through with its plans even if someone was in the apartment and that the group planned to restrain anyone who was present. And Mendez testified that although they believed the apartment was empty when they arrived, they took duct

21

tape and zip ties with them when they entered the apartment to use as restraints if someone was there.  Taking this evidence in the light most favorable to the State, this evidence is sufficient to support a finding that Calo or his accomplices intended to take property from or in the presence of another person.  Accordingly, this sufficiency argument fails.

## III.  JUDGMENT AND SENTENCE

Calo next argues that because his attempted first degree robbery conviction merged with the first degree felony murder charge, all references to the attempted first degree robbery conviction, including reference to the special verdict on that count, must be deleted from the judgment and sentence.  We agree and remand to the trial court with directions to amend the judgment and sentence to reflect only the first degree murder and first degree burglary convictions and special verdicts related only to those convictions.  *See State v. Fuller*, 169 Wn. App. 797, 833, 282 P.3d 126 (2012).

## IV.  SAG

In his SAG, Calo claims that (1) he received ineffective assistance of counsel, (2) the trial court improperly relied on its memory of Calo's codefendants' trials, (3) the trial court erred when it refused to strike all of Mendez's testimony after the State spoke to Mendez during a recess to "clarify" his testimony and when it allowed the State to reopen its direct examination, (4) he should not have been tried under an accomplice liability theory and the accomplice liability instruction was improper, (5) there was insufficient evidence that he participated in the crime under the corpus delecti rule, (6) the trial court erred in admitting several exhibits, (7) the trial court erred when it denied the motion to suppress his police interviews, (8) the State engaged in prosecutorial misconduct during its opening statement, (9) the trial court erred when it allowed testimony about

Mexican drug cartels, (10) the trial court erred when it refused to give defense counsel's proposed *Petrich*[20] instruction, (11) the trial court erred when it failed to excuse a juror who saw Calo in custody in the hallway, (12) he should not have been charged for crimes for which he was acting as a paid informant, (13) he received ineffective assistance of appellate counsel, and (14) cumulative error deprived him of a fair trial. Calo is not entitled to relief on any of these grounds.

## A. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Calo contends that he received ineffective assistance of counsel because his trial counsel (1) failed to request a "Cultural Competency Evaluation" before addressing the suppression motion and (2) failed to object to testimony and evidence that Calo had been bailed out of jail in the past. SAG at 1. Neither of these claims have merit.

### 1. STANDARD OF REVIEW

To prevail on his ineffective assistance of counsel claims, Calo must show that his trial counsel's performance fell below an objective standard of reasonableness based on all the circumstances and that this deficient performance was prejudicial. *State v. Nichols*, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). To establish prejudice, Calo must prove that, but for the deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *Nichols*, 161 Wn.2d at 8. We presume that counsel was effective and require Calo to show the absence of legitimate strategic or tactical reasons for the challenged conduct. *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995).

---

[20] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), *overruled on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

2.    "CULTURAL COMPETENCY" EVALUATION

Calo first contends that his trial counsel provided ineffective assistance of counsel by failing to obtain a "Cultural Competency Evaluation" before the trial court addressed pretrial matters. SAG at 1. Specifically, he asserts that such an evaluation, which he contends would have addressed his foreign-born status, his lack of understanding of English, and his "'dyslexia syndrome,'" would have been relevant to the totality of the circumstances test that the trial court applied when it examined whether Calo was in custody or whether he waived his *Miranda* rights prior to his interviews with Detective Bunton and Investigator Catlett. SAG at 2.

The record shows that at least by the time Calo moved for reconsideration of the trial court's CrR 3.5 decision, the trial court knew of and considered Calo's foreign-born status, his lack of understanding of English, and his potential dyslexia. Calo does not explain what a cultural competency evaluation would have disclosed in addition to these factors. He does not show how counsel's failure to request such an evaluation was prejudicial, and this claim fails.

3.    EVIDENCE OF PRIOR RELEASE ON BAIL

Calo further contends that he received ineffective assistance of counsel because his trial counsel did not object to Yeto's testimony that he had paid Calo's bail three times. Calo contends that this was impermissible ER 404(b) testimony. Calo fails to show that he is entitled to relief on this ground.

a.    ADDITIONAL FACTS

When testifying about his relationship with Calo, Yeto testified that he eventually had issues with Calo in part because Calo would get arrested for driving without a license and Yeto would have to bail Calo out of jail. Yeto specifically testified about helping Calo's friends bail

him out of jail in October 2012. When the State later asked Yeto how many times he paid bail for Calo, Yeto responded that he had bailed Calo out three times. Defense counsel did not object to this testimony.

b.  DISCUSSION

"ER 404(b) prohibits a court from admitting '[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith.'" *State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007) (alterations in original) (quoting ER 404(b)). Although ER 404(b) "prohibit[s] admission of evidence designed simply to prove bad character; [ER 404(b)] is not intended to deprive the state of relevant evidence necessary to establish an essential element of its case." *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995). Thus, evidence of other bad acts may be admissible for other purposes, such as proof of motive, intent, or preparation. ER 404(b); *Foxhoven*, 161 Wn.2d at 175. But before admitting ER 404(b) for another purpose, the trial court must weigh the probative value against its prejudicial effect. *Foxhoven*, 161 Wn.2d at 175.

Evidence that Yeto had bailed Calo out of jail suggests that Calo had prior arrests, which would qualify as evidence of other crimes and is, therefore, potentially subject to ER 404(b). But the evidence that Yeto had paid Calo's bail three times was not admitted to prove Calo's bad character. Instead, it was admitted to establish the relationship between Yeto and Calo.

And it does not appear that the admission of the evidence that Yeto had bailed Calo out three times was prejudicial. Even without the references to bail, the jury was aware that Calo had been in jail at least twice before his arrest on the murder, robbery, and burglary charges because there was evidence that Calo was in jail when he claimed to have been given the message to deliver

to Yeto—a fact Calo relied on in his own closing argument—and there was evidence that Calo was in jail on other charges when he made his February 22 statement. In addition, other witnesses also testified about assisting Calo with bail. Although Yeto mentioned that he had bailed out Calo three times, it is unlikely this additional reference to bail was prejudicial given the other evidence of Calo's prior arrests.

Furthermore, Yeto testified that he usually had to help Calo with bail because Calo had been jailed on driving-related violations, which is not highly prejudicial.

Because the fact Calo had been bailed out was not admitted to prove action in conformity therewith and this evidence was not unfairly prejudicial, it is unlikely that the trial court would have sustained an objection to the admission of the bail testimony had defense counsel objected. Accordingly, Calo does not establish deficiency. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004) (to establish ineffective assistance of counsel based on a failure to object, the appellant must show "that the proposed objection would likely have been sustained[ ] and that the result of the trial could have been different if the evidence had not been admitted") (footnote omitted).

### B. RELIANCE ON KNOWLEDGE OF CO-DEFENDANTS' TRIALS

Calo next asserts that the trial court improperly relied on information that came from Calo's co-defendants' trials, which the trial court had heard. Calo appears to contend that in doing so, the trial court relied on personal experience, which he equates with the trial court acting as a witness in violation of ER 605.[21]

---

[21] ER 605 provides, "The judge presiding at trial may not testify in that trial as a witness. No objection need be made in order to preserve the point."

1.    ADDITIONAL FACTS

Before the suppression hearing, the parties and the trial court discussed the statements that were to be addressed at the hearing, and the parties commented on how they wanted to handle various admissibility issues. When discussing possible redactions, defense counsel said the parties and the trial court could address the redactions when the exhibits were going to be presented to the jury. The State responded that this was how they approached the redactions "in the codefendant case." 1 VRP at 10. The trial court responded, "You know, I'm at a bit of—I'm not sure whether it's an advantage or disadvantage having heard this case twice now already, but we'll just see what happens [during the suppression hearing]." 1 VRP at 10.

After the testimony in the suppression hearing, defense counsel argued that the videos of the interviews demonstrated that Calo was in custody during the interviews that occurred after his release from jail. During argument, defense counsel asked whether a reasonable person who believed that his statements in the prior interview were the reason he was out of jail would feel free to leave during those interviews.

The trial court responded,

No, I just fingered Yeto. I'm free. I'm out. Got it. Perfect. I want to get out. I will finger Yeto. Now I'm out. Oh, good, with my gun. With my dope. Go where I want to go. Come and pick me up. And, hey, by the way, give me some more money, would you, 'cause I'm running out of the money you gave me, 'cause I got other things to do when I finish this interview like go shopping, because I'm free to leave, because I fooled the heck out of everybody.

6 VRP at 484-85. Defense counsel commented, "Well, it's pretty clear that the detectives didn't think that" and argued that Calo was not free to leave. 6 VRP at 485.

27

Later, the trial court asked defense counsel if Calo's motive for speaking to the officers was relevant to whether Calo had been in custody during the interviews. The following discussion ensued:

THE COURT: Well, I'm asking you [is whether Calo's motive] matter[s], okay?

[DEFENSE COUNSEL]: Your Honor, I believe that --

THE COURT: [Defense counsel], if I'm bound and determined to take over a drug operation and the way I do that is to finger Mr. X so you take him away for murder, does that matter if it's that or is [sic] I'm just dying to get out of jail?

[DEFENSE COUNSEL]: *There's no facts in evidence --*

THE COURT: I'm just asking a hypothetical question.

[DEFENSE COUNSEL]: That's pure speculation.

THE COURT: Does motive matter?

[DEFENSE COUNSEL]: Your Honor --

THE COURT: Because if I'm really motivated and I'm going to put the finger on Mr. X and the lawyer has said don't do it, don't talk to the cops, why don't you wait or whatever. I mean, does the motive matter?

. . . .

[DEFENSE COUNSEL]: No. . . .

. . . .

THE COURT: Okay.

(Pause in Proceedings)

[DEFENSE COUNSEL]: Your Honor --

THE COURT: Go ahead.

[DEFENSE COUNSEL]: -- that -- I understand the Court's question in terms of what -- what does his motive matter, and that's not supported by Mr. Alvarez Calo's statements. That's the State's theory of why Mr. Alvarez Calo did what he did, but it's not supported by any of the evidence in this court today, anything that's been established in our hearing. And, you know, quite frankly --

THE COURT: Sure it was. I mean, *there was testimony that Mr. Jacinto says, no, that wasn't the problem*. It wasn't -- it wasn't Yeto and [Hidalgo-Mendez], it wasn't Yeto and Borrero, it wasn't Yeto and Marteen, it was Willie Calo got iced out -- let me finish -- by Yeto, and he's pissed and he wanted to put the finger on Yeto.

[DEFENSE COUNSEL]: *Jacinto did not testify to that, Your Honor.*

THE COURT: Well, I mean, that was the testimony and it was hearsay, but that's what changed their view. Because all of a sudden it wasn't just about driving a car, it was like, oh, my God, these guys have a real beef.

[DEFENSE COUNSEL]: For example, Your Honor, had Mr. Alvarez Calo been properly advised, and even if he had gotten the opportunity to explain for even another half an hour to an hour longer, the story, and if an attorney, any attorney

28

had listened to that, he had two or three at that point, if any of them had heard, well, I'm going to tell them this and here's my theory behind it, they could have said, oh, you're claiming that you were afraid for your life so you passed a message to do this? That's not a defense for this case. That's going to expose you to this amount of time if they charge you.

And I will submit to this Court that any reasonable person knowing this is what I have to risk by opening my big mouth versus staying silent and resolving my misdemeanor case and my identity theft case for four months, he could have balanced the risks. He could have made a decision but, at this point, we are speculating. Well, would Mr. Alvarez Calo have done it? What was his motive? Would he have done it anyway? And I submit to you no reasonable person would do this to themselves if they had been properly advised. They wouldn't.

And we don't have any information before the Court to say, oh, well, he would have done it anyway. That's the question. We don't know.

THE COURT: Yeah. And I'm not sure that an objective reasonable person standard is what we look to here. I think we look at this particular defendant.

6 VRP at 507-11 (emphasis added).

2.    DISCUSSION

The trial court's potential references to facts from the other trials occurred during the CrR 3.5 hearing and related to whether Calo's motive for speaking to the officers was relevant to whether Calo was in custody. Although the trial court mentioned testimony from "Mr. Jacinto" that was not before the court during this hearing, that testimony related to Calo's motive to give his statements, which was not relevant to the dispositive issue of whether Calo was in custody when he gave the statements. Because Calo's custody status was the key to the suppression issue, any potential references to testimony from other trials relating to motive was irrelevant and any potential error was harmless. *See In re Estate of Hayes*, 185 Wn. App. 567, 602, 342 P.3d 1161 (2015) (applying harmless error to ER 605 claim). Accordingly, Calo is not entitled to relief on this ground.

Calo also briefly contends that the trial court's reference to the evidence from other trials demonstrated that the trial court violated the appearance of fairness doctrine. We disagree.

29

"The appearance of fairness doctrine seeks to prevent 'the evil of a biased or potentially interested judge.'" *State v. Carter*, 77 Wn. App. 8, 12, 888 P.2d 1230 (1995) (quoting *State v. Post*, 118 Wn.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992)). We presume that a trial court performed its functions regularly and properly without bias or prejudice. *Hickok-Knight v. Wal-Mart Stores, Inc.*, 170 Wn. App. 279, 318, 284 P.3d 749 (2012). The party claiming bias or prejudice must support the claim with evidence of the trial court's actual or potential bias. *Post*, 118 Wn.2d at 619.

The trial court acknowledged that it had prior experience with related cases and the record shows that the trial court may have referenced facts from a prior case when discussing Calo's motive during the suppression hearing. But the trial court's consideration of these extraneous facts during the suppression hearing was harmless and there is nothing in the record demonstrating that this prior experience prejudiced or biased the court during the trial. Accordingly, this claim also fails.

### C. REFUSAL TO STRIKE MENDEZ'S TESTIMONY

Calo next contends that the trial court erred when it refused to strike Mendez's testimony after the State spoke to him during a recess to "clarify" Mendez's testimony. Calo also contends that it was error for the trial court to allow the State to reopen its direct examination of Mendez. We disagree.

1. ADDITIONAL FACTS

During the trial, Mendez testified about what happened immediately after the shooting. After Mendez testified that he returned to Calo's garage following the shooting, the State asked Mendez whether Calo had told him (Mendez) that he (Calo) had talked to anyone about the

shooting. Mendez testified that Calo said he had talked to Robinson and Yeto that night. Mendez further testified that he had been present when Yeto called Calo. When the State asked, "What did you hear of the conversation," the trial court interrupted and held a side bar. 19 VRP at 2370. Following the side bar, the trial court told the State to proceed and to come back to this line of questioning later.

When the trial court called a recess, it put the sidebar on the record. The trial court stated that part of its concern had been that the portions of Mendez's testimony relating to the call from Yeto "seemed incongruent with [Mendez's] earlier testimony" that Calo already knew about the shooting from Robinson and Yeto and that Mendez may try to testify about what Yeto said to Calo. 19 VRP at 2375. The trial court stated, "I asked for the break and I asked counsel to move on to another topic because I didn't want to put counsel in a position of either suborning a perjurious statement or opening up a door which shouldn't be opened to testimony of what Yeto may have said." 19 VRP at 2376. The State responded, "I've been able to clarify with the witness. He was confused by my questions. So I will ask about the timing of those phone calls and whether or not he was present and --." 19 VRP at 2376.

Defense counsel stated that he wanted to know what Mendez told the State and commented, "I am a little bit concerned that counsel is clarifying [Mendez's] testimony." 19 VRP at 2376. The State responded,

> What [Mendez] told me was that right when he got there, [Calo] said, "we got the wrong guy," that he understood that there was a phone call from [Robinson]. He was there when the phone call came from Yeto but he doesn't know -- he can't be sure if it was that night or the next morning."

19 VRP at 2377.

Defense counsel responded,

He certainly was clear about what it [sic] happened when he was testifying.

And, Your Honor, this is the problem with clarifying testimony as well, you know, after the witness has taken the stand and is still supposed to be on the stand.

You know, I think it's clear that this witness is not being truthful. I think it's clear every time he opens his mouth about this case that he's not being truthful. And it certainly -- I think the Court has rightfully, you know, has some concerns about that issue.

But I'm particularly troubled by the State clarifying testimony from a witness when they were still on the stand off the record. In other words, they are having conversations with him off the record about what their testimony -- in other words, pointing out problems with their testimony.

19 VRP at 2377. The State responded that defense counsel had mischaracterized what she had

said.

Defense counsel responded,

I understand you were clarifying it. And, Your Honor, quite honestly, I'm not accusing or I don't want to accuse [the State] of doing anything improper, not intentionally. But I think by clarifying this issue with a witness, off the record, while he is still on the stand testifying, she is certainly letting him know that there are concerns with his testimony and that's why he is quote, clarifying his testimony.

I have a motion at this time to basically strike all of the testimony of this witness and instruct the jury to disregard. I think the Court is correct when you say that there were concerns about possibly supporting perjurious testimony.

19 VRP at 2377-78.

The State responded that defense counsel could explore this "area" on cross-examination and that Mendez's current testimony was consistent with his prior testimony and statements. The State also asserted that it was not improper to talk to Mendez and ask if he knew what time the calls came in, noting that this was "a question that [she could] ask when [Mendez] gets back on the stand." 19 VRP at 2378. The State, however, asserted that asking the trial court to make a credibility determination was improper.

The trial court responded,

32

> Yeah. I think the remedy in this case is cross-examination. And I think, you know, you have to divide one into two. I think the defense is, you know, clearly can ask him well, you said this morning that you knew that [Calo] already knew and he heard it from these people and you can cross-examine about, well, he said the call was really the next day.
>
> So I do think the remedy is cross-examination.

19 VRP at 2378-79.

When the jury returned, the State reintroduced the line of questioning, stating, "Before we broke, you said [Calo] received a call from Yeto?" 19 VRP at 2391. Mendez agreed that he had said this. The State then asked Mendez if he recalled when Yeto had called.

Defense counsel objected, arguing that this question had been asked and answered. The trial court overruled the objection, and Mendez testified that the call came in "that night and the next morning." 19 VRP at 2392. The State responded that it was "confused," and Mendez started to respond when defense counsel raised a hearsay objection. 19 VRP at 2392. The trial court ruled, "I'm going to sustain the objection as to the confusion." 19 VRP at 2392. The State moved on to another line of questioning.

On cross-examination, defense counsel questioned Mendez about whether he had been present when Yeto called Calo. Mendez admitted that he had first testified that he was not there when the call came in and that he then later testified that he was there.

2.    DISCUSSION

Calo appears to argue that the trial court should have struck all of Mendez's testimony because the State privately consulted with Mendez to clarify its questions about when Calo spoke to Yeto on the phone. Calo asserts that the State's conversation with Mendez was, at the very least, coaching the witness. But there is no restriction prohibiting counsel from privately consulting with his or her witness during trial. *State v. Delarosa-Flores*, 59 Wn. App. 514, 516,

799 P.2d 736 (1990). And although Mendez's testimony changed after this consultation, Calo does not show that the State's consultation with Mendez was improper. Furthermore, as the trial court recognized, Calo had every opportunity to explore the effect of this consultation on Mendez's testimony during cross-examination by inquiring into the nature of the consultation with the State and the reasons for the change in testimony. *Delarosa-Flores*, 59 Wn. App. at 516-17.

Calo further argues that the trial court erred when it allowed the State to "'reopen'" its direct examination of Mendez. SAG at 12. After the defense finished cross-examining Mendez, the trial court allowed the State to reopen its direct examination of Mendez because the State had failed to question Mendez about the witness tampering charge. The jury, however, acquitted Calo on the witness tampering charge. So even if it was error to allow the State to reopen its direct examination, any potential error was harmless beyond a reasonable doubt because it was not relevant to any of the charges that the jury found Calo guilty of.

### D. ACCOMPLICE LIABILITY CLAIMS

Calo next raises two issues related to accomplice liability. These claims fail.

1. SUFFICIENCY OF EVIDENCE OF ACCOMPLICE LIABILITY

Calo contends that "he should not have been tried under the accomplice liability statute." SAG at 14. This appears to be a sufficiency of the evidence argument.

"A person is an accomplice of another person in the commission of a crime if . . . [w]ith knowledge that it will promote or facilitate the commission of the crime, he or she . . . [s]olicits, commands, encourages, or requests such other person to commit it; or . . . [a]ids or agrees to aid such other person in planning or committing it." RCW 9A.08.020(3). Calo asserts only that there was no evidence that he was an accomplice because the testimony showed that it was Mendez,

rather than himself (Calo), who was delivering the orders and there was evidence that to the extent Calo planned the robbery, the other participants abandoned his plan.[22] But Mendez testified that the incident in Chocolate City was planned, organized, and initiated by Calo and that Calo provided the firearms to the participants. That the individuals involved in the plan to rob and kill Yeto abandoned that part of the plan does not show that Calo was not an accomplice to the Chocolate City incident. Taken in the light most favorable to the State, Mendez's testimony is sufficient to support the conclusion that Calo was an accomplice to the Chocolate City incident.[23] *Mines*, 163 Wn.2d at 391.

2.    ACCOMPLICE LIABILITY JURY INSTRUCTION

Calo next contends that the accomplice liability instruction was improper under *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713 (2000). This issue fails.

Calo proposed the following accomplice liability instruction:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of *the crime*.
> A person is an accomplice in the commission of a crime if, with <u>actual</u> knowledge that it will promote or facilitate the commission of *the crime <u>charged</u>*, he or she will [sic] either:
> (1)    solicits, commands, encourages, or requests another person to commit *the crime <u>charged</u>*; or
> (2)    aids or agrees to aid another person in planning or committing *the crime <u>charged</u>*.
> The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and

---

[22] Calo does not challenge any other element of accomplice liability.

[23] We note that to the extent Calo is arguing that Smith's testimony, which implicated Calo to a lesser degree, was more credible, we do not weigh credibility on appeal. *Mines*, 163 Wn.2d at 391.

ready to assist by his or her presence is aiding in the commission of the crime <u>charged</u>. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

CP at 101 (emphasis added; underlining in original). Other than omitting the underlining, the trial court's accomplice instruction was identical to the defense proposed instruction.

Because Calo proposed the jury instruction he is now challenging, any potential error was invited error, so Calo is not entitled to relief on this ground. *See State v. Henderson*, 114 Wn.2d 867, 871, 792 P.2d 514 (1990) (a party cannot set up an error at trial and then complain of it on appeal). Furthermore, even if we were to address this issue on the merits, it would fail because the accomplice liability instruction here did not contain the language that was at issue in *Roberts*.

E. CORPUS DELECTI

Calo further contends "that there was insufficient evidence, absent his incriminating statement(s), to support the charges under the Corpus Delicti [sic] Rule." SAG at 14. He asserts that without his statements "there was no other independent evidence to suggest that he was an accomplice to the principals['] crimes." SAG at 18. We disagree.

The corpus delecti rule requires the State to "present evidence independent of the incriminating statement that the crime a defendant described in the statement actually occurred." *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006) (emphasis omitted). To determine if there is sufficient independent evidence, "we review the evidence in the light most favorable to the State." *Brockob*, 159 Wn.2d at 328. The independent evidence need only "provide prima facie corroboration of the crime described in a defendant's incriminating statement." *Brockob*, 159 Wn.2d at 328 (emphasis omitted). "Prima facie corroboration of a defendant's incriminating

36

statement exists if the independent evidence supports a 'logical and reasonable inference of the facts sought to be proved.'" *Brockob*, 159 Wn.2d at 328 (internal quotation marks omitted) (quoting *State v. Aten*, 130 Wn.2d 640, 656, 927 P.2d 210 (1996)). Additionally, "the independent evidence 'must be consistent with guilt and inconsistent with a[] hypothesis of innocence.'" *Brockob*, 159 Wn.2d at 329 (alteration in original) (internal quotation marks omitted) (quoting *Aten*, 130 Wn.2d at 660).

Here, Mendez's testimony was sufficient to satisfy corpus delecti. Mendez testified that the men involved in the murder were doing so at Calo's direction and that Calo also provided the firearms to the individuals involved. This evidence, which is independent of Calo's statements, is consistent with guilt and inconsistent with a hypothesis of innocence and provides prima facie corroboration of the crimes described in Calo's incriminating statements. Accordingly, this claim fails.

## F. ADMISSION OF EXHIBITS

Calo next contends that the trial court erred when it admitted exhibits 82, 96, 97, 98, 176, 215, 216, 217, 218, 220, and 222.[24] Calo is not entitled to relief on these grounds.

### 1. STANDARD OF REVIEW

We review the admission of evidence for an abuse of discretion. *State v. Griffin*, 173 Wn.2d 467, 473, 268 P.3d 924 (2012). "An abuse of discretion occurs if the court's decision is manifestly unreasonable or rests on untenable grounds." *Griffin*, 173 Wn.2d at 473. The erroneous admission of evidence is harmless and does not require reversal, absent a reasonable probability

---

[24] Although none of these exhibits are part of the record on appeal, the record sufficiently describes the records to permit review.

that the error materially affected the outcome of the trial. *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993).

2.      WITNESS'S DRAWING:  EXHIBIT 82

Calo asserts that exhibit 82 was admitted over objection and that "[t]he trial court actually indicated it was concerned about appellate review." SAG at 26. But no one objected to the admission of this exhibit, so his argument is waived. ER 103.

3.      POST-MORTEM PHOTOGRAPHS:  EXHIBITS 96, 97, AND 98

Calo argues that the trial court erred when it admitted, over defense objection, exhibits 96, 97, and 98, several autopsy photographs that Calo asserts were "sexually explicit and gruesome." SAG at 20. He contends that these photographs were unnecessary because there was no dispute that someone had died and that they were unfairly prejudicial.

> "Accurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect." *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983). Photographs have probative value when "they are used to illustrate or explain the testimony of the pathologist performing the autopsy." *State v. Lord*, 117 Wn.2d 829, 870, 822 P.2d 177 (1991), [*abrogated by State v. Schierman*, ___ Wn.2d ___, 415 P.3d 106 (2018)]. . . . This court, however, looks unfavorably on repetitious, inflammatory photographs. *Crenshaw*, 98 Wn.2d at 806.

*State v. Brett*, 126 Wn.2d 136, 160, 892 P.2d 29 (1995).

Exhibit 96 was described as a post-mortem photograph of the victim's body as it was when it first arrived in the morgue. Defense counsel argued that this photograph was overly prejudicial because it was a gruesome photograph and the pathologist could testify about the wound, because it unnecessarily showed some of the victim's pubic hair and because exhibit 118 also showed the location of the entry wound.

The pathologist testified in voir dire that exhibit 96 showed "the exact wound characteristics that allow[ed him] to describe what kind of wound that is and its location" and that it also demonstrated that the victim's body was correctly preserved for evidence. 12 VRP at 1425. In addition to showing the fatal gunshot wound, it showed the victim's hands in brown paper bags, which the pathologist later testified was to preserve evidence, and it showed "some pubic hair." 12 VRP at 1306. The trial court admitted exhibit 96 over the defense objection. The pathologist later referred to exhibit 96 when testifying about the location of the injury and he testified that the bags were on the victim's hands to preserve evidence.

The record shows that exhibit 96 was not particularly sexually explicit as it showed only "some" of the victim's pubic hair. 12 VRP at 1305-06. And although there was other evidence that the victim had died of a gunshot wound, it was not an abuse of discretion to allow some photographic evidence to support the testimony on that subject, and the pathologist testified that this exhibit helped him explain the location of the entry wound and how it appeared when the victim first arrived at the morgue. In addition, it supported the pathologist's testimony regarding how the evidence on the body had been preserved. The record shows that this was the only photograph of the body as it arrived in the morgue and the only photograph relevant to the preservation of evidence. Thus, this photograph was useful to the pathologist's testimony, it was not overly prejudicial, and it was not cumulative. Accordingly, Calo has not shown that the trial court erred when it admitted exhibit 96.

Exhibits 97 and 98 were described as post-mortem photographs showing the location of the gunshot wound on the victim's body. The pathologist testified that these exhibits showed the entry wound and that of the two, exhibit 97 was the better exhibit because it more clearly showed

the location of the wound. The trial court denied admission of exhibit 98 because it was cumulative, but the court admitted exhibit 97.

Because the trial court excluded exhibit 98, Calo cannot object to the admission of that exhibit. And the trial court's exclusion of exhibit 98 demonstrates that the trial court reduced the number of post-mortem photographs in order to avoid cumulative evidence. Furthermore, exhibit 97 was a clearer depiction of the entry wound, so it was not cumulative to exhibit 96. Accordingly, the trial court did not abuse its discretion when it admitted exhibit 97.

4.      BULLET FRAGMENTS: EXHIBIT 176

Calo next objects to the admission of exhibit 176 over defense counsel's foundation objection. Exhibit 176 is "a bullet fragment from the medical examiner's office." 12 VRP at 1365.

Even presuming, but not deciding, that the trial court erred when it admitted this exhibit, any potential error was harmless. This exhibit contained bullet fragments. There was no dispute that the victim died of a gunshot injury. Thus, there is no reasonable probability that the admission of the bullet fragments materially affected the outcome of the trial and any potential error in admitting this exhibit was harmless. *See Halstien*, 122 Wn.2d at 127.

5.      VICTIM'S CLOTHING: EXHIBITS 215, 216, 217, 218, 220, AND 222

Calo next argues that the trial court erred when it admitted exhibits 215, 216, 217, 218, 220, and 222, various pieces of the victim's clothing, over defense counsel's foundation objection. Again, this claim fails.

Even presuming, but not deciding, that the trial court erred when it admitted these exhibits, any potential error was harmless. These exhibits were various articles of the victim's clothing and some of the articles of clothing had a single bullet hole in them. Again, there was no dispute that

40

the victim had been shot. Thus, there is no reasonable probability that the admission of the victim's clothing materially affected the outcome of the trial and any potential error in admitting these exhibits was harmless. *See Halstien*, 122 Wn.2d at 127.

## G. DENIAL OF SUPPRESSION MOTION

Calo next contends that his statements to the officers should be suppressed because the officers engaged in an impermissible "two-step" interrogation process. SAG at 24 (capitalization omitted). He also appears to contend that he was entitled to *Miranda* warnings because he was interrogated. And he asserts that these issues are not the same as the suppression issues raised by his appellate counsel. In addition, Calo argues that custody was not required. Although Calo is correct that these issues differ from the arguments presented by his appellate counsel, Calo is not entitled to relief on these grounds.

### 1. TWO-STEP INTERROGATION PROCESS

Relying on *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 543 (2004), Calo argues that the trial court should have suppressed his statements to the officers because they used an impermissible two-step interrogation process. A two-step interrogation process involves law enforcement officers questioning a suspect during a custodial interrogation without providing *Miranda* warnings until the suspect confesses and then obtaining a *Miranda* waiver and continuing the interview to reelicit the confession. *See State v. Hickman*, 157 Wn. App. 767, 772, 238 P.3d 1240 (2010).

Although *Seibert* addresses the two-step interrogation process, the *Siebert* Court presumed the key factor here, whether the defendant was in custody for purposes of *Miranda*. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1129-30 (9th Cir. 2005) (citing *Seibert*, 542 U.S. at

41

603)). Because, as discussed above in section I.B, *supra*, Calo was not in custody for purposes of *Miranda* during the February interview, Calo does not challenge the trial court's conclusions that he was not in custody during the March interviews,[25] and Calo was advised of his *Miranda* warnings at the beginning of the June 21 interview, *Seibert* is not instructive.

Calo also relies on *United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006), and *Hickman*. But as in *Seibert*, the defendants in *Williams* and *Hickman* were in custody for purposes of *Miranda* when the interrogations at issue in those cases took place. *Williams*, 435 F.3d at 1150 n.1; *Hickman*, 157 Wn. App. at 770-71. Here, Calo was not in custody for purposes of *Miranda* on the relevant crimes.

2.      INTERROGATION

Citing *United States v. Booth*, 669 F.2d 1231 (9th Cir. 1981), and *United States v. Moreno-Flores*, 33 F.3d 1164 (9th Cir. 1994), Calo also appears to assert that he was entitled to *Miranda* warnings because the officers' questioning was an interrogation. But again, whether the interviews were interrogations is irrelevant unless Calo can establish that he was in custody. As explained above, we disagree that he was subjected to custodial interrogation.

3.      CUSTODY REQUIREMENT

Calo also asserts that under *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), a custodial interrogation is not required. But unlike here, at the time of the relevant statements, the defendant in *Massiah* had already been arrested and indicted and had retained counsel. 377 U.S. at 202, 205. Because Calo was not charged with the relevant crimes

---

[25] *See* fn. 27, *infra*.

or in custody for those crimes when he made the statements at issue here, *Massiah* does not apply, and Calo is not entitled to relief on this ground.

Because Calo was not in custody for purposes of *Miranda* on the relevant crimes during the first three interviews and was advised of his *Miranda* rights before the officers questioned him during the fourth interview, the trial court did not err when it denied Calo's motion to suppress his statements resulting from the four interviews.

H. PROSECUTORIAL MISCONDUCT CLAIMS

Calo next contends that several statements the State made during its opening statement amounted to prosecutorial misconduct. These claims fail.

1.      LEGAL PRINCIPLES

To establish prosecutorial misconduct, Calo must establish "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). To establish prejudice, Calo must show that "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" *Magers*, 164 Wn.2d at 191 (alteration in original) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)). "During an opening statement, a prosecutor may state what the State's evidence is expected to show." *Magers*, 164 Wn.2d at 191.

A "failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). But when the defense objects and the trial court sustains the objection and gives a

curative instruction to the jury, we presume that the jury follows the court's instructions. *State v. Hopson*, 113 Wn.2d 273, 287, 778 P.2d 1014 (1989).

2.      JIGSAW PUZZLE REFERENCES

Calo first contends that the State's references to a jigsaw puzzle analogy was improper because it minimized the reasonable doubt standard. We disagree.

In its opening statement, the State stated that understanding the case based on the evidence presented in the case was similar to putting together a jigsaw puzzle. The State further stated that the opening statement was to provide a roadmap and continued its puzzle analogy by suggesting that the opening statement was akin to having the picture on the box available when working on the puzzle. Calo did not object to this statement.

Even presuming, but not deciding, that this issue was preserved for appeal, this argument fails. Although jigsaw puzzle analogies can be improper when the State attempts to analogize to the burden of proof,[26] this is not the case here. Here, the State was not referring to jigsaw puzzles in an attempt to explain the burden of proof, but rather as a way of describing the purpose of an opening statement. Accordingly, the State's references to jigsaw puzzles did not amount to prosecutorial misconduct.

3.      "[S]PINS A [S]TORY"

Calo next contends that the State's statement that Calo "'spins a story'" improperly expressed the prosecutor's personal belief in Calo's guilt and improperly vouched "for adverse witness credibility." SAG at 25. Calo is not entitled to relief on this ground.

---

[26] *See, e.g.*, *State v. Johnson*, 158 Wn. App. 677, 684, 243 P.3d 936 (2010).

In its opening statement, after outlining what it intended to show with regard to the charged crimes, the State began to describe Calo's initial contact with the officers investigating the murder:

> So, in February, the following year, about three months later, the defendant, [Calo], finds himself in a bit of a pickle, and he wants a favor from the police, and he's got this idea. And his idea is if I go to the Lakewood Police Department and I tell them I've got some tidbits about this murder case that I bet you haven't solved, I'll bet you'll do me a favor. And he's absolutely right.
>
> So in come Detective Les Bunton and Investigator Catlett. And they meet with [Calo] because they've got a cold case on their hands. They've got nowhere to go. And they know it. *And [Calo] spins a story for them.* And what [Calo] tells them --.

11 VRP at 1144-45 (emphasis added). Defense counsel objected to this statement. The trial court sustained the objection and told the jury to "disregard the comment that [Calo] spins a story for them." 11 VRP at 1145.

Calo contends that the State's reference to Calo "'spin[ning] a story'" for Detective Bunton and Investigator Catlett expressed the prosecutor's opinion of Calo's guilt and "improperly vouch[ed] for adverse witnesses['] credibility." SAG at 25. Acknowledging the trial court's curative instruction, Calo further contends that the jury disregarded the court's curative instruction. But there is nothing in the record showing that the jury ignored the curative instruction. Because the trial court directed the jury to disregard the challenged portion of the State's opening statement and there is no evidence in the record that the jury failed to follow the court's curative instruction, Calo fails to establish that he is entitled to relief on this ground.

4.     REFERENCES TO CALO'S DRUG USE

Calo also contends that the State's assertion that Calo "'had a problem'" and was drug addicted was improper and amounted to prosecutorial misconduct. SAG at 24-25. Calo is not entitled to relief on this ground.

During its opening statement, the following exchange occurred:

> [STATE]: Now, [Calo] *had a problem*. His problem was he was not a good businessman. The drug business can be easy. It can be dangerous, but it can be easy money. But [the] first rule is don't use your own product. If you use your own product, you use too much of it, you cut into your profits. And if you use way more than enough and you really get addicted, you'll just cut yourself right down into deep debt and you won't be making any money and the guy who supplies you will be very angry about that. And that was where [Calo] got to. [Calo] got --
>
> [DEFENSE COUNSEL]: I'm going to object at this time, Your Honor.
>
> THE COURT: I'm going to sustain the objection.
>
> [DEFENSE COUNSEL]: Thank you.
>
> [THE STATE]: [Calo] got to a point where he owed Yeto --
>
> [DEFENSE COUNSEL]: Well, I'm going to ask the Court to order the jury to disregard his last statement regarding my client's use of drugs. There's no evidence of that. And, quite honestly, Your Honor, I'm going to ask the Court to order the prosecutor not to proceed down this line of argument -- or statement line.
>
> THE COURT: Okay. Jurors, let me say that, as indicated earlier, these are not facts. You have to determine the facts in this case. This is opening statement. This is the evidence that the State expects you to find. You may or may not find that evidence, okay?
>
> Let me see counsel at sidebar just a second.
>
> (Pause in Proceedings)
>
> THE COURT: Okay. Sorry to interrupt.
>
> . . . .
>
> [THE STATE]: Thank you.
>
> The testimony in this case will show that [Calo] got himself into trouble with Yeto. [Calo] was deep in debt to Yeto, and you don't do that. So, eventually, Yeto says I'm cutting you off. I'm not supplying you with dope anymore. And luckily for [Calo], Yeto wasn't mad enough to do something more about it than that. So [Calo] goes out and he finds a new source, a guy named Marteen.
>
> Now, [Calo] doesn't really change his business ways and eventually finds himself deep in debt with Marteen as well. I mean, [Calo's] *got a problem*. Because once Marteen cuts him off, his reputation is going to be trashed and he's going to have a heck of a time finding somebody to provide him with dope, which he desperately needs.
>
> So [Calo] decides I gotta come up with a plan. And his plan is to do something drastic. He goes to his friend Jiffary Alexander Mendez, who he's known for many years since they've been in school together some years ago in this area. [Calo] goes to [Mendez] and he says here's the problem. And [Mendez] knows all about it because [Mendez] knows all about [Calo's] drug dealing *and drug usage*. And [Mendez] says I get it. I know what we need to do. I understand your plan.

11 VRP at 1133-36.

Even presuming, but not deciding, that the State's references to Calo's drug use were improper, Calo does not establish that this argument was prejudicial. To establish prejudice, Calo must show that "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" *Magers*, 164 Wn.2d at 191 (alteration in original) (quoting *Pirtle*, 127 Wn.2d at 672). Given the nature of this case, it was clear to the jury that Calo was heavily involved in drug activity and that he was indebted to those engaged in the drug business. The reason for that indebtedness, Calo's drug use, was of little importance, and Calo does not show that there was a substantial likelihood that the State's statement referencing his drug use affected the jury's verdict. Accordingly, Calo is not entitled to relief on this ground.

5.      "[H]ARD [O]PENERS"

Calo also generally asserts that this "type[] of hard opener[]" is intended to secure convictions and may be overly prejudicial. SAG at 26. Again, Calo is not entitled to relief on this ground.

The purpose of an opening statement is to allow the State to outline its case and to describe what it intends to prove at trial. *See Magers*, 164 Wn.2d at 191. By its very nature, opening statements are prejudicial to the defendant because they reflect the State's case against the defendant. But if the State goes beyond describing what it intends to prove at trial and makes statements intended to bias or prejudice the jury, the defendant can, as Calo does here, challenge those statements. But the prosecutor did not make statements that were intended to bias or unfairly prejudice the jury and because we address Calo's specific arguments above and he does not

47

identify any additional specific instances of alleged prosecutorial misconduct, we do not address this contention further.

In sum, we hold that Calo's prosecutorial misconduct claims either fail to establish that the State made improper statements or that any potentially improper statements were prejudicial. Accordingly, Calo's prosecutorial misconduct claims fail.

## I. ADMISSION OF GANG AND CARTEL EVIDENCE

Calo next contends that the trial court erred in allowing the State to present "testimony about the cartel gang and low level cartel gang drug dealers over defense objections to violations of motions in limine." SAG at 28. He appears to assert that the trial court had excluded all gang evidence and then erroneously ruled that Mexican drug cartel evidence was not gang evidence. He also contends that (1) there was no evidence that he or any of his accomplices were part of "the same gang, cartel, or organization," (2) the drug cartel evidence was not admissible under ER 404(b) because it was not relevant to prove any element of the crimes charged, and (3) the admission of the drug cartel evidence violated his First Amendment right to free association because there was no nexus between the crime and membership in the cartel. SAG at 29. Calo is not entitled to relief on these grounds.

### 1. ADDITIONAL FACTS

#### a. MOTION IN LIMINE

In a motion in limine, Calo asked the trial court to "[p]rohibit the testimony of any alleged gang experts or any other expert not previously disclosed to the defense." CP at 90. He asserted that the trial court should exclude such testimony because the State had "not identified any witness who will offer testimony on gangs, drug culture, or drug cartels" as required under CrR

4.7(a)(2)(ii). CP at 92. Calo's motion in limine did not mention relevancy, ER 404(b), or the First Amendment right to association.

The trial court orally ruled,

> Prohibit the testimony of any alleged gang experts or any other expert not previously disclosed. I'm not aware of any gang experts. That was more of an issue with other alleged participants. And, in fact, in the transcript, one person is identified as a leader of the Bloods, another person is identified as a Crip, and there's some discussion about gang stuff. None of those discussions implicate [Calo]. But unless I hear different from the State, I'd be inclined to grant that motion.

7 VRP at 541. The State did not object. Although Calo's motion in limine mentioned "drug cartels," Calo did not draw this to the trial court's attention when the trial court made its ruling. CP at 92. Nor did Calo raise to the trial court any relevancy, ER 404(b), or First Amendment right to association issues in his motion in limine.

### b. MEXICAN DRUG CARTEL TESTIMONY AND ADDITIONAL OBJECTIONS

During trial, Investigator Catlett testified about his background, which included investigating "drug trafficking organizations that operated [in Lakewood] that were based kind of in Mexico." 14 VRP at 1616. When the State asked Investigator Catlett "what kind of things would you see with a low level drug dealer," Calo objected based on lack of relevance. 14 VRP at 1617. The trial court overruled the objection.

Investigator Catlett then described how low-level dealers purchased drugs in "ounce quantities" then broke them into "gram quantities" to sell. 14 VRP at 1617. He stated that low-level dealers did not make much money and that they usually worked "to feed their own habits or for them to just pay their own bills." 14 VRP at 1617. He further testified that the difference between low- and mid-level dealers was the quantity of drugs that they were able to obtain.

When the State asked Investigator Catlett if he had "been able to draw any conclusions about how these organizations out of Mexico work and how they're related to each other," Calo objected. 14 VRP at 1622. Calo argued that this question violated the trial court's ruling in limine regarding gang evidence. The trial court allowed the witness to respond, and Investigator Catlett answered yes. At that point, the trial court called a sidebar.

The trial court later described the sidebar on the record and the following discussion ensued:

> THE COURT: I want to put our sidebar on the record. There was an objection to the question about how narcotics enterprises work. *One objection was relevance*, the other related to our pretrial motion regarding avoiding reference to gang references, and I overruled the objection believing that the workings of the narcotics enterprises are relevant and I didn't believe that this was the equivalent of the concerns we had about gang testimony, which related more to what [are] statutorily known as street gangs, and that may be involved in this case. Thanks.
> Do you want to supplement the record?
> [DEFENSE COUNSEL]: No, Your Honor, other than I didn't -- I thought the motion in limine was pretty clear; everyone's telling me it wasn't. When I talk about gangs I -- criminal gangs, and that would include this type of organization. Surprisingly enough, Detective Catlett, right after you get done making your ruling, you know, used the exact same phrase, gangs, when he was talking about, you know, the Mexicans or the drug users or the organizations in Mexico, you know. So, yeah, I had made a ruling -- you made your ruling, we're ready to move on.
> THE COURT: Sure. Thank you.
> [DEFENSE COUNSEL]: But if it becomes an issue later on --
> [THE STATE]: I will just try to walk the fine line between leading and open-ended questions, and now Investigator Catlett knows that we're not going to say the word "gang," but I don't believe he was --
> [DEFENSE COUNSEL]: Well, it's not an issue of the use of the word "gang."
> [STATE]: Right. But he -- he wasn't talking in the same terms as with street gangs, so.
> [DEFENSE COUNSEL]: All right. Yeah. And, again, Your Honor, the motion wasn't premised on the fact that, you know, he used the word "gang" as prejudicial, but it's premised because when you start talking to people and saying that people are associated with this organization or that organization, *you know, it's basically guilt by association* and --
> . . . .

50

> [DEFENSE COUNSEL]: *Defendant's right to free association.* And so that's the problem.
>
> THE COURT: Okay. The record is made and I think you --
>
> . . . .
>
> . . . preserved the objection.

14 VRP at 1638-40 (emphasis added).

After the trial court ruled on the objection, Investigator Catlett testified about how the Mexican drug cartels are organized. He testified,

> [I]n Mexico, everyone knows about cartels, they get talked about a lot. Those are really just, um, almost like big gangs. They operate in the similar fashion in -- in Mexico where most of the violence is. They control the narcotics at the production level. And then it's usually passed off to what we call plaza bosses or just higher-ups within their organizations. You can think of almost like a lieutenant in a mafia-style organization.
>
> They get passed, the drugs, are given to those people to then worry about logistics. So kind of each one of them, these plaza bosses might have their own lines that get into the United States. They have to get them to the border of Mexico, then they have to cross them into the United States. Each one of those steps being -- is extreme [sic] difficult and they -- they have to use different methods to hide things getting there.

14 VRP at 1623-24.

The State then asked Investigator Catlett whether the individual groups "organize themselves around geography and family ties." 14 VRP at 1624. Investigator Catlett responded that they did and that they also were organized around "friendship ties." 14 VRP at 1625. Investigator Catlett further testified that the group he was investigating "was from a town in Michoacan, Mexico" and that they had been distributing drugs in Tacoma for "many years." 14 VRP at 1625. The group also had ties to Oakland, California.

Later, Investigator Catlett testified that he considered Yeto, Hidalgo-Mendoza, and Borrego to be "high level dealers," but he explained that this did not mean that they were "high up in a Mexican drug organization." 16 VRP at 1827. Investigator Catlett further testified that these

individuals were actually "towards the bottom of the actual organization, if they even belong to it specifically. But high up as far as amounts that they're distributing here in Washington." 16 VRP at 1827. Calo did not object to this testimony. Catlett further testified that although he did not initially know that Yeto was involved with Hidalgo-Mendoza, he eventually realized that the two were working together.

In addition, Yeto testified that Calo worked for him selling drugs. Yeto also testified that he got his drugs from and worked for his cousin, Hidalgo-Mendoza. Yeto also testified that Borrego lived in Mexico and would contact Hidalgo-Mendoza and have Hidalgo-Mendoza deliver drugs to someone in California. Yeto further testified that he knew that Hidalgo-Mendoza had an argument with Borrego about drugs, money, and a car. Yeto also testified that the trafficked drugs originated in Michoacan, Mexico.

2.    DISCUSSION

We review the admission of evidence for an abuse of discretion. *Griffin*, 173 Wn.2d at 473. "An abuse of discretion occurs if the court's decision is manifestly unreasonable or rests on untenable grounds." *Griffin*, 173 Wn.2d at 473. The erroneous admission of evidence is harmless and does not require reversal, absent a reasonable probability that the error materially affected the outcome of the trial. *Halstien*, 122 Wn.2d at 127.

Focusing on relevancy and ER 404(b), Calo asserts that the trial court erred when it refused to characterize the Mexican drug cartel evidence as gang evidence. Although the trial court ruled that it did not consider the Mexican drug cartel evidence to be the same as the general street gang evidence it had ruled was inadmissible in the motion in limine, the trial court still considered whether the Mexican drug cartel evidence was admissible on the grounds Calo later presented.

Thus, regardless of how the trial court classified the Mexican drug cartel evidence, Calo does not show that the trial court failed to address the objections he had to the introduction of the Mexican drug cartel evidence.

Calo objected to Mexican drug cartel evidence on two grounds that are relevant here: relevancy and the right to association. Calo did not object on ER 404(b) grounds. And an objection on relevance grounds does not preserve an appeal based on ER 404(b). *State v. Mason*, 160 Wn.2d 910, 933, 162 P.3d 396 (2007). Accordingly, we consider only whether this Mexican drug cartel evidence was relevant and whether the introduction of this evidence violated Calo's right to free association.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The Mexican drug cartel evidence was relevant to the issue of motive. The State argued that Calo carried out the charged crimes in order to increase his status within the organization, and an understanding of how Mexican drug cartels are structured and how they function was relevant to that claim. Additionally, the record contains evidence that Calo was working for Yeto, who in turn worked for Hidalgo-Mendoza, and that they were involved, at least to some degree, in Mexican drug cartel activities. Accordingly, this evidence was relevant.

Further, the affiliation evidence did not violate Calo's First Amendment right to association. "Association evidence is only inadmissible when it proves nothing more than a defendant's abstract beliefs." *State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050 (1995). The constitutional right to free association does not bar the admission of associational evidence when such evidence is relevant to a material issue at trial. *Campbell*, 78 Wn. App. at 822. Here,

Calo's affiliation was relevant to show motive. Thus, the admission of the Mexican drug cartel evidence did not violate Calo's right to association.

Calo does not show that the trial court abused its discretion when it admitted the Mexican drug cartel evidence. Accordingly, Calo is not entitled to relief on this ground.

## J. REFUSAL TO GIVE PROPOSED *PETRICH* INSTRUCTION

Calo next contends that the trial court erred when it refused to give the defense's proposed *Petrich* instruction. Calo does not establish that he is entitled to relief on this ground.

### 1. ADDITIONAL FACTS

Defense counsel proposed the following *Petrich* instruction:

> The State alleges that the defendant committed acts of felony murder in the first degree on multiple occasions. To convict the defendant of felony murder in the first degree one particular act must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved.

CP at 107. This instruction was a modified version of 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.25, at 117 (4th ed. 2016), and excluded the last line of the pattern instruction.

The trial court declined to give Calo's proposed *Petrich* instruction. Instead, it opted to give a to-convict instruction that was "written like a *Petrich* instruction" and a special verdict form requiring the jury to state whether it was unanimous as to each of the charged means. 23 VRP at 2721. Defense counsel objected and argued that a separate *Petrich* instruction was required.

The trial court's to-convict instruction stated, in part,

> To convict defendant Alvarez Calo of the crime of murder in the first degree as charged in Count I, each of the following four elements of the crime must be proved beyond a reasonable doubt:
> (1)    That on or about the 12th day of November, 2012, defendant Alvarez Calo or an accomplice committed or attempted to commit:

>              (a) Robbery in the first degree
>                      (OR)
>              (b) Burglary in the first degree.
>
> . . . .
>
> *If you find from the evidence that elements (1), (2), (3), and (4), and either of [the] alternative elements (1)(a) or (1)(b), have been proven beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. (1)(a) and (1)(b) are alternatives and only one need be proved. In order to return a verdict of guilty, you must unanimously agree that alternative element (1)(a) has been proved, or that alternative element (1)(b) has been proved.*

CP at 182 (emphasis added).

The trial court's special verdict instruction stated,

> We, the jury, return a special verdict by answering as follows:
> QUESTION 1: Did the defendant, acting as a principal or an accomplice, commit or attempt to commit robbery in the first degree?
> ANSWER: _____ (Write "yes" or "no" or "not unanimous")
> QUESTION 2: Did the defendant, acting as a principal or an accomplice, commit or attempt to commit burglary in the first degree?
> ANSWER: _____ (Write "yes" or "no" or "not unanimous")

CP at 206. The jury answered yes to both question 1 and question 2.

2.    DISCUSSION

> In "multiple acts" cases, the jury must unanimously agree as to which incident constituted the crime charged. Where multiple acts relate to one charge, the State must elect the act on which it relies to convict the defendant, or the trial court must provide a unanimity instruction—a *Petrich* instruction. [101 Wn.2d at 572]. The failure to do so in multiple acts cases is constitutional error. "The error stems from the possibility that some jurors may have relied on one act or incident and some [jurors a different act], resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

*State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009) (second alteration in original).

Although the trial court refused to give Calo's proposed *Petrich* instruction, even

presuming, but not deciding, that a *Petrich* instruction was required in this context, the trial court's

instructions included the protections that Calo sought. Both Calo's proposed *Petrich* instruction

and instruction 17 required the jury to unanimously agree as to which predicate offense had been proved beyond a reasonable doubt. This is sufficient to protect Calo from the risk that some jurors may have relied on one act while other jurors relied on a different act in arriving at their guilty verdict. The trial court's special verdict also ensured that the jurors were unanimous.

Because the trial court's instructions contained the same protections as Calo's proposed unanimity instruction, the trial court did not err when it rejected Calo's proposed instruction. Accordingly, Calo is not entitled to relief on this ground.

### K. FAILURE TO EXCUSE JUROR

Calo next argues that the trial court erred when it refused to grant Calo's motion to excuse a juror after the juror observed Calo in the hallway during a break in the trial. We disagree.

#### 1. ADDITIONAL FACTS

During a break in the State's case, the trial court advised the parties that it had learned that juror 9 might have observed Calo with a corrections officer. At the trial court's request, the corrections officer described what had happened:

> We were out there in between the door that goes to the bathroom in front of the freight elevator, and [Calo] was actually against the wall so *you could not see his cuffs at all at any time*. And I'm pretty sure it's Juror No. 9 walked by the door, which has a small window, it was a split-second look in and then turned around and walked to the right, so.

15 VRP at 1774 (emphasis added).

Despite defense counsel's concern that questioning the juror would bring undue attention to the incident, the trial court then questioned juror 9 about what he had seen. The trial court asked juror 9 the following question:

I had a quick question. So, when you left for lunch today you got out a little earlier than some of the other folks. Did you happen to observe the defendant, [Calo], talking to his lawyers or talking to anybody or anything?

15 VRP at 1776. Juror 9 responded,

What happened was I was going to use that bigger restroom back there because somebody went in there, but right when I opened up the door I saw a sheriff or whatever with the defendant, so I turned and went -- and went down the elevator.

15 VRP at 1776-77.

The trial court then asked the juror who he had seen with Calo. Juror 9 responded, "I don't really know, to be honest. I know there was one other person, but I didn't really get a good look at him." 15 VRP at 1777. The juror confirmed he did not hear anything that anyone may have been saying. The trial court then asked juror 9 not to talk to any of the other jurors about the questions the court had asked. The trial court also told the juror that it was making sure that he did not observe or hear any privileged discussions and sent the juror back to the group.

Defense counsel moved to excuse juror 9, arguing that the juror saw Calo "without counsel, you know, basically, in custody or in the presence of the two corrections officers waiting for the elevator." 15 VRP at 1778. The State opposed the motion.

The corrections officer verified that when the juror saw him, Calo was leaning against the wall with his hands behind his back "so there was no way" anyone could see the handcuffs. 15 VRP at 1780. Defense counsel responded that it would be obvious that Calo was in handcuffs because his hands were behind his back. The trial court denied Calo's motion to excuse juror 9.

2.    DISCUSSION

We review a trial court's decision on whether to excuse a juror for abuse of discretion. *State v. Hughes*, 106 Wn.2d 176, 204, 721 P.2d 902 (1986); *State v. Jorden*, 103 Wn. App. 221,

226, 11 P.3d 866 (2000). "An abuse of discretion occurs if the court's decision is manifestly unreasonable or rests on untenable grounds." *Griffin*, 173 Wn.2d at 473.

Here, the corrections officer testified that juror 9 only briefly glanced at Calo and that Calo was positioned in a way that no one could have seen his restraints. And although juror 9 verified that he briefly glimpsed Calo and that Calo was with someone, the juror also stated that he was not sure who Calo was with. Given these facts, the trial court did not abuse its discretion when it denied the motion to dismiss juror 9.

## L. IMMUNITY

Calo next asks that we examine whether the State could use the statements he gave as a paid informant as the basis of the charges against him. Although Calo attempts to frame this question as a general question of law, we address this issue in the context of this case.

Whether the State may charge an informant based on information provided to the police depends on whether the informant has an immunity agreement with the prosecutor. *See State v. Unga*, 165 Wn.2d 95, 103-05, 196 P.3d 645 (2008). Here, there is no evidence of any kind of immunity agreement. Accordingly, the State was not prohibited from charging Calo with any crimes in which he implicated himself.

## M. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Calo next contends that he received ineffective assistance of appellate counsel based on his appellate counsel's failure to address several of the issues Calo raised in his SAG and his supplement to his SAG.[27] We disagree.

---

[27] Calo filed a motion to substitute appellate counsel. Our commissioner denied the motion and determined that it would instead be considered "as a supplement to" Calo's ineffective assistance

To establish appellate ineffective assistance of counsel, Calo must show that the legal issues that his appellate counsel failed to raise had merit and that the failure to raise these issues was prejudicial. *See In re Pers. Restraint of Maxfield*, 133 Wn.2d 332, 344, 945 P.2d 196 (1997). We have addressed each of the claims Calo has raised in his SAG and have held that he is not entitled to relief under any of those claims. Accordingly, Calo does not show that these legal issues had merit and his ineffective assistance of appellate counsel claim based on his appellate counsel's failure to raise the claims in Calo's SAG fails.

As to Calo's supplemental ineffective assistance of appellate counsel claim, it also fails. Appellate counsel's advice and decision not to file a reply reflect counsel's reasonable professional or tactical decisions. And the only possible misstatement appellate counsel made was stating that there was no right to a speedy appeal. Although there is no constitutional right to a speedy appeal, an inordinate delay in an appeal may result in a due process violation. *State v. Lennon*, 94 Wn. App. 573, 577, 976 P.2d 121 (1999). But Calo does not say why this potential error prejudices him. Accordingly, Calo's ineffective assistance of appellate counsel claim fails.

### N. CUMULATIVE ERROR

Finally, Calo contends that he is entitled to a new trial based on cumulative error. We disagree.

"[A] defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Calo must show that "while multiple trial errors, 'standing alone, might not be of sufficient gravity to

---

of appellate counsel claim in his SAG. Ruling Den. Mot. to Substitute Counsel, *State v. Calo*, No. 49794-8-II (Wash. Ct. App. June 27, 2018).

constitute grounds for a new trial, the combined effect of the accumulation of errors most certainly requires a new trial.'" *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017) (quoting *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984)). We have considered all of the potential errors that are not individually prejudicial[28] and conclude that these potential errors did not render Calo's trial fundamentally unfair. Thus, this claim fails.

## V. LEGAL FINANCIAL OBLIGATIONS

In supplemental briefing, Calo argues that recent amendments to the statutes addressing LFOs require us to vacate the $200 criminal filing fee and $100 DNA collection fee that the trial court imposed. The State agrees and also contends that the recent amendments require the trial court to strike the LFO interest provisions.

The 2018 amendments prohibit the imposition of the criminal filing fee on defendants found indigent under RCW 10.101.010(3)(a) through (c). LAWS OF 2018, ch. 269, §17. Although the trial court found Calo indigent for purposes of appeal, the record does not reveal if he was found indigent under RCW 10.101.010(3)(a) through (c). Thus, remand to determine whether the criminal filing fee can be imposed under the 2018 amendments is required.

The 2018 amendments also prohibit the imposition of the DNA collection fee if Calo's DNA has already been collected as the result of a prior conviction. LAWS OF 2018, ch. 269, § 18; RCW 36.18.020(2)(h); RCW 43.43.7541. Calo has a prior felony conviction, but the record does

---

[28] We have considered the following potential errors, which we held were harmless: (1) trial counsel's failure to object to the testimony that Calo had been bailed out of jail three times, *see* IV.A.3, *supra*, (2) the trial court's reliance on information from other trials, IV.B, *supra*, (3) admission of the bullet fragments and the victim's clothing, IV.E.4, IV.E.5, *supra*, (4) the prosecutor's reference to Calo's drug use, IV.G.4, *supra*.

not reveal whether the DNA has already been collected.[29]  Thus, remand for the trial court to determine whether it can impose the DNA collection fee under the 2018 amendments is required.

Finally, the 2018 amendments prohibit the accrual of interest on nonrestitution LFOs as of June 7, 2018.  LAWS OF 2018, ch. 269, § 1.  Accordingly, remand for the trial court to strike all interest on nonrestitution LFOs after June 7, 2018 is required.

Accordingly, we affirm the convictions but remand this matter for further action consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.

---

[29] The State asserts that its records show that Calo's DNA was previously collected and is on file. This factual assertion is, however, outside the record before this court.